I N THE U NITED S TATES D ISTRICT C OURT
FOR THE D ISTRICT OF N EW M EXICO
_____

CARLOS CRUZ, ANDRES HERNANDEZ,
GENARO PEREZ IBARRA, RACHEL
HIGGINS, Esq., as Personal Representative of
Narciso Bandala-Flandes, Deceased, PAULA
GAMINO-LAZARO, GUADALUPE
BANDALA-GAMINO, MONICA BANDALA-
GAMINO, and MIGUEL ANGEL BANDALA-
GAMINO,

                **Plaintiffs,**

**and**

ZIA TRUST, INC., a New Mexico corporation
as Personal Representative of the Estate of
Mitchell Rosario Ortega, and as Conservator
of Irvin Naveda Rosario, and LEONARDO
ROSARIO QUITARIO,

              **Plaintiffs-in-Intervention,**

**v.**                               **No. CIV 06-538 BB/DJS**

BRIDGESTONE/FIRESTONE NORTH
AMERICAN TIRE, LLC,

                **Defendant.**

M EMORANDUM O PINION
AND
O RDER L IMITING P LAINTIFFS' E CONOMIC E XPERTS

       THIS MATTER is before the Court on the Motions of Defendant

Bridgestone/Firestone to Exclude the Proposed Damage Testimony of M. Brian

McDonald [Doc. 77] and William J. Patterson [Doc. 79], and the Court having reviewed all submissions, finds the motions should be Granted in Part.

### *Background Facts*

This lawsuit arises out of a one vehicle accident that occurred on February 25, 2006, on Interstate 10 in New Mexico.  The vehicle, a 1988 Chevrolet Suburban or GMC, was occupied by twelve citizens of Mexico who had entered the United States illegally.  Two of the occupants of the Suburban were killed in the accident and several were injured.  Plaintiffs claim the accident occurred when the Suburban "overturned because the tread on the left rear tire on the van separated, causing the tire to deflate resulting in the van going into an uncontrollable swerve and rolled over resulting in injuries to Carlos Cruz, Andres Hernandez, Genaro Perez Ibarra, and the death of Narciso Bandala-Flandes."  (First Am. Compl.)  Plaintiffs allege the left rear tire was manufactured by Firestone and was defective.

Because Plaintiffs were deported and are not allowed to return to the United States, it is difficult to obtain full and current personal information.  However, the following profiles are based primarily on their answers to interrogatories.

Plaintiff Carlos Cruz was 39 years old at the time of the accident.  He received a tenth grade education from a school in Mexico.  According to Mr. Cruz, his employment consisted of working at a potato chip factory in Mexico for two years, at a warehouse in Mexico for two years, and at a sewing facility in Mexico which he

operated with his brothers.  He had also worked in Las Vegas, Nevada, for an unspecified time earning $6.50 per hour as an assemblyman for a company that manufactured parts for machines in casinos.  During the same time, he also worked as a janitor where he earned $6.50 per hour.  He was attempting to return to Las Vegas at the time of the accident.  He seeks recovery for a fractured pelvis, sacrum and pubis, a fractured right shoulder, a fractured right arm, and maybe a fractured left leg along with continuing pain.

Plaintiff Andres Hernandez was 46 years old at the time of the accident.  He also has a tenth grade Mexican education.  According to Mr. Hernandez, following high school he was employed in farming for several years and later worked as a mechanic in a clothing factory, both in Mexico.  In 1995, he went to Las Vegas, Nevada, where he worked for four years earning $4.75 per hour washing vegetables.  He then worked in Los Angeles, California, for a year in landscaping and yard maintenance earning $6.50 per hour.  He returned to Las Vegas where he worked earning $9.50 per hour as a handyman in a casino, and as a-janitor at a casino spa earning $8.00 per hour.  Mr. Hernandez was hoping to return to his job as a janitor in Las Vegas.  He claims as a result of the accident he sustained a fractured skull and multiple fractures to his jaw requiring placement of a steel plate.  He also seeks recovery for continuing pain, primarily radiating from his neck, and to suffer from frequent intense headaches.

Narciso Bandala-Flandes died at the scene of the accident. He was born on June 21, 1978, and was 27 years old at the time of his death. He is survived by his widow, Plaintiff Paula Gamino-Lazaro, and his three minor children, Guadalupe Bandala-Gamino, Monica Bandala-Gamino, and Miguel Angel Bandala-Gamino. The extent of his education is unknown. He was self-employed in Mexico from 1991 until his death and earned $480 to $600 per month as a construction worker and tile setter.

Plaintiff Genaro Perez-Ibarra was 31 years old at the time of the accident. The extent of his education is not known. Mr. Perez-Ibarra makes claims for injuries from the accident consisting of a fractured sternum, a pneumothorox, a liver hematoma/contusion, three fractured ribs, and possible lumbar fractures. Mr. Perez-Ibarra did farm work in Mexico before coming to the United States. He subsequently worked at a Kansas factory manufacturing jars, and at a Kansas newspaper printing shop. The length of his employment and wages are unknown.

The final individual identified in Dr. McDonald's report is Alfredo Perdomo-Cordova. Although Plaintiffs have expressed a desire to join Mr. Perdomo-Cordova as a Plaintiff, they have not done so. Nothing is known about Mr. Perdomo-Cordova except that he apparently wishes to claim compensation for injuries in the accident.

Plaintiff-in-Intervention Zia Trust, Inc., has been appointed personal representative of the estate of Mitchell Rosario Ortega ("Ortega") and conservator for Irvin Naveda Rosario ("Rosario"). Mr. Ortega was born on March 7, 1990, and was

4

15 years old at the time of the accident.  He had just completed secondary school in Mexico and died at the scene of the accident.  Apparently Mr. Ortega worked as a carpenter's helper and welder in the family workshop in Mexico earning approximately $90-100 per week.  Mr. Rosario was 16 years old at the time of the accident.  He was not married and did not have any children.  He too had recently completed secondary school in Mexico.  Mr. Rosario suffered a fractured pelvis, lacerations of his bladder, an injury to his knee, and other injuries to internal organs and serious bruises.  He had been employed collecting oranges and grapefruits and selling the same with his father in Mexico.  He reportedly earned approximately $19 per day.

### *Dr. McDonald's Report*

There is no dispute that Dr. Brian McDonald is a recognized economist qualified to express an opinion on each Plaintiff's damages.  *See* FED. R. EVID. 702.  However, he does not attempt any economic analysis of each individual's loss of earnings or economic potential.  Rather, based on a lengthy analysis of New Mexico case law, he provides the value of an average statistical life in the United States.  He concludes:

> While I do not have an opinion concerning the specific dollar amount of loss of enjoyment of life for any of these plaintiffs, I will provide testimony as assistance to the trier of fact concerning the specialized knowledge of economists regarding the value of a statistical life <u>in the United States</u>. The well accepted, peer-reviewed economic research on the value of a statistical life places a range of the <u>value of a statistical life in the United States</u> at $5.0 to $6.0 million in today's dollars (emphasis added).

Dr. McDonald explains his methodology as one of balancing employee risk against potential rewards:

> A typical value of statistical life study starts with the research hypothesis that businesses have to pay workers a higher wage, everything else equal, to accept employment in a more risky job, a job with a higher probability of an on-the-job death.  Standard, well accepted multivariate statistical analysis is applied to a large sample of workers in different occupations and industries with known differences in the probability of annual job fatality.  Controlling for other factors in wage determination such as education, years of experience, union/non-union job, region of the country, and gender, multivariate statistical analysis is used to prove or disprove this research hypothesis.  An estimate of the wage premium is quantified in the analysis, and these results are used to <u>infer how we as a society (i.e., a large group of workers) value a statistical life.</u>
>
> Actual industry job fatality data tell us, for example, that each year one out of every 10,000 workers will die from an on-the-job accident.  We do not know which worker, but based upon historical data it will be one worker out of 10,000 workers.  For accepting this risk, each worker is paid a wage premium of say $500 (estimated by the multi variate statistical analysis).  Collectively, these 10,000 workers are paid $5.0 million (10,000 times $500) to accept the risk that one of them will die.  We do not know which one of them will die, that is why it is referred to as a statistical life.  Thus, <u>as a society</u> (a large group of workers) this evidence suggests that we value a statistical life by [sic] $5.0 million (emphasis added).

### *William Patterson's Report*

No one has challenged William Patterson's economic background or expertise under RULE 702.  Like Dr. McDonald, he appears frequently in New Mexico courtrooms giving forensic economic testimony.  Unlike Dr. McDonald, however, Mr. Patterson's report does attempt to calculate the lost earning capacity of Plaintiffs-in-Intervention Rosario and the decedent, Ortega.  He calculated Mr. Rosario would earn

$639,094 if he worked until age 62 and $782,501 if he worked until age 76.  If Mr. Rosario lived until age 76, his injuries would also cost him $660,574 in the value of lost wages.  Mr. Patterson also calculates damages for loss of the pleasure of life for Mr. Rosario at $10,000 per year, increasing at an annual rate of 1%.  In addition, Mr. Patterson's economic analysis of the "present value of each one hour per day lost household services" and the "present value of each $1,000 per year future medical expenses."

Mr. Patterson then goes on to combine earning capacity with these other factors to reach an average value of life:

> Economic theory regarding an individual's trade off between labor and leisure assumes that one will work until the marginal return from an additional hour of work falls below the value of one hour of leisure. Earning capacity measures the value of our work.  Pleasure of life damages measure the <u>value we place on time away from work</u>, and the <u>intangible pleasure we sometimes derive</u> from our work.

> Economic studies of consumer behavior and labor markets yield estimates of the value of lives in the range of about $500,000 and $11 million dollars, with an average of about $3 million.  These estimates apply to a "statistical" life, and are based on economic decisions made by large groups of consumers and workers. The values are for an entire life, from cradle to grave, and include earnings as well as intangible enjoyment.  These studies are likely helpful to finders of fact in determining a plausible range for compensation for lost pleasure of life, when considered in light of other evidence and testimony concerning the pleasure of life of the individual plaintiff or decedent (emphasis added).

*Discussion*

Initially, the Court notes both of these methods attempt to place a dollar value on how Americans value their leisure as well as the overall statistical value we place on our lives.  Federal courts have frequently rejected such testimony on the quantification of life under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).[1]

More relevant in this case can these factors assist jurors in awarding damages to Plaintiffs who are not the "average American" as, indeed, they are not Americans. Defendant contends *Hoffman Plastic Compounds, Inc v. National Labor Relations Board*, 535 U.S. 137 (2002), prohibits any use of Department of Labor statistics or statutory minimum wages for undocumented workers as it is illegal for any employer in the United States to hire or pay Plaintiffs.

Plaintiffs argue that this is a diversity case and New Mexico law has long allowed jury's to consider damages based on an American wage scale in wrongful death and personal injury cases.  *Torres v. Sierra*, 553 P.2d 721 (N.M. App. 1976), was a case involving the death of an undocumented worker, where Judge Lewis Sutin recognized:

> The cause of action created by the Wrongful Death Act inures to the plaintiff as a vested right.  This right includes giving an instruction on damages for wrongful death.

---

[1]     *Smith v. Ingersoll-Rand*, 214 F.3d 1235, 1245 (10th Cir. 2006) (summarizing federal cases rejecting hedonic damages through 2000); *Estate of DuBose v. City of San Diego*, 2002 WL 34408963 (S.D. Cal.); *see also McGarry v. Horlacher*, 775 N.E.2d 865, 877 (Ohio App. 2002).  While this Court has expressed its own doubts as to the utility of allowing expert testimony on hedonic damages, *McGuire v. City of Santa Fe*, 954 F. Supp. 230, 232 (D.N.M. 1996), using statistical average American values are particularly problematic in the present context.

8

553 P.2d 725 (citations omitted).  This Court certainly cannot disagree with either of these propositions.  However, Judge Sutin then went on to approve the district court permitting an economist to base the undocumented workers' damages on projected future American wages and affirmed the exclusion of the testimony of Border Patrol agents regarding deportation as speculative.  The logic and language used in *Hoffman Plastic* calls these rulings into question.

In *Hoffman Plastic*, the Supreme Court reversed the Court of Appeals for the District of Columbia Circuit and held the Immigration Reform and Control Act of 1986 ("IRCA") foreclosed an NLRB award of backpay to a claimant who was not legally authorized to work in the United States.  And while this holding itself would not unequivocally preclude Dr. McDonald and/or Mr. Patterson from considering United States earnings projections, Chief Justice Rehnquist used very preclusive language in the majority opinion.  The Court initially noted it had "consistently set aside awards of reinstatement or backpay to employees found guilty of serious illegal conduct in connection with their employment."  535 U.S. 143.  The Court then outlined the intent and scope of the 1986 IRCA:

> As we have previously noted, IRCA "forcefully" made combating the employment of illegal aliens central to "[t]he policy of immigration law." It did so by establishing an extensive "employment verification system," designed to deny employment to aliens who (a) are not lawfully present in the United States, or (b) are not lawfully authorized to work in the United States. ...

> Similarly, if an employer unknowingly hires an unauthorized alien, or if the alien becomes unauthorized while employed, the employer is compelled to discharge the worker upon discovery of the worker's undocumented status. Employers who violate IRCA are punished by civil fines, and may be subject to criminal prosecution.

535 U.S. 147-48 (internal citations omitted).

Whether the New Mexico courts would follow *Torres* at this stage thus seems somewhat doubtful[2] as New Mexico law allows compensation for the value of lost earnings and the lost value of family services "reasonably certain" to be lost in the future, discounted to present value.  U.J.I. Nos. 13-1803; 13-1810; 13-1822; *see Mitchell v. Lovato*, 640 P.2d 925, 927 (N.M. 1982) (damages are not "reasonably certain" if they are inherently speculative).  Whether any or all of Plaintiffs would even be employed by an American employer prior to being apprehended and removed is not "reasonably certain."  Moreover, whether each or any of these undocumented workers would work in the United States for any length of time much less until they were age 65 or 76 is "inherently speculative."

Whether or not Dr. McDonald's risk premium or Mr. Patterson's labor versus leisure theories are valid, then, begs the question in this case.  Both theories create a

---

[2]     Some courts have held the IRCA precludes any award of lost wages on allegations of the wrongful death of, or injury to, an illegal alien.  *See, e.g., Veliz v. Rental Serv. Corp. USA, Inc.*, 313 F. Supp. 2d 1317, 1336-37 (M.D. Fla. 2003); *Hernandez-Cortez v. Hernandez*, 2003 WL 22519678  (D. Kan.); *but see Madeira v. Affordable Housing Foundation*, 469 F.3d 219, 249 (2d Cir. 2006) (holding the IRCA did not preclude state damage awards so long as the jury was instructed to consider that the alien could be deported when calculating future compensation).

significant range of values.[3]  More significantly, however, both are based exclusively on wage scale and consumer choices in the United States.  Several of the Plaintiffs had spent the majority of their working career employed in Mexico and were only sporadically in the United States.  *See, e.g.*, Hernandez Interrog. Ans. 3; Cruz Interrog. Ans. 2, Bandala-Flandes Interrog. Ans. 1; Perez-Ibarra Interrog Ans. 3.  Mr. Rosario and Mr. Ortega, on the other hand, were only 15 and 16 years of age at the time of the accident and neither had ever been employed in this country.

*Daubert*, of course, requires that expert testimony be based on reliable principles and methods.  *United States v. Mamah*, 332 F.3d 475 (7th Cir. 2003).  Moreover, as gatekeeper, the district judge must determine that the witness has applied these principles and methods reliably to the specific facts of the case at bar.  *Daubert*, 509 U.S. at 592-93; *Goebel v. Denver & Rio Grande Western R. Co.*, 346 F.3d 987, 991 (10th Cir. 2003); *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003).  In *MicroStrategy Inc. v. Business Objects, S.A.*, 429 F.3d 1344 (Fed. Cir. 2005), the district court excluded a damage expert's opinion because it did not link any of his damage theories to the facts of the case at bar.  In affirming, the Federal Circuit Court of Appeals said:

> Stated simply, an expert need not consider every possible factor.  At the same time, the district court has the responsibility to exclude an expert

---

[3]  Dr. McDonald states he "will provide testimony as assistance to the trier of fact regarding the value of a statistical life in the United States.  He claims America as a society (a large group of workers) this evidence suggests that we value a statistical life by [sic] $5.0 million"  (emphasis added). This method he explains spreads such factors as union membership, education, and region of the country across a broad enough statistical so as to eliminate their importance on a given case.  Like Dr. McDonald's study, Mr. Paterson's is based on the American "studies of consumer behavior and labor markets [and] yield estimates of the value of the lives in the range of about $500,000 to $11 million.

opinion that overlooks factors that render the testimony unreliable and/or speculative.

In this case, the record shows that the excluded expert report did not link a single loss to a specific misconduct and ignored significant factors that might have excluded the torts as the reason for the losses. For these reasons, the district court was well within its discretion to exclude it.

429 F.3d at 1355-56; *see also Zenith Elec. Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d

416, 419-20 (7th Cir. 2005); *Cochrane v. Schneider Nat'l Carriers, Inc.*, 980 F. Supp. 374,

379 (D. Kan. 1997).

Neither Dr. McDonald nor Mr. Patterson made any attempt to acknowledge the Mexican citizenship of the Plaintiffs or the legal barriers to their earning the average American wages which are the foundation of both experts' studies. This Court finds *Daubert* requires a much more tailored approach. In Note, *Immigration, Compensation and Preemption: The Proper Measure of Lost Future Earning Capacity Damages After Hoffman Plastic Compounds, Inc. v. NLRB*, 58 Baylor L. Rev. 985 (2006), Hugh Alexander Fuller points out the pitfalls of a simplistic approach of merely assuming any undocumented worker will earn the average wage over a statistical lifetime in the United States:

No fixed rule determining how to measure such damages exists, but the plaintiff must put on some evidence other than mere "guesswork and speculation." The court should take into account the plaintiff's probable future income, the length of time the plaintiff would have earned that income, and the plaintiff's age and future increase in skill. In cases involving illegal aliens, the court should also take into account other factors, such as whether the alien committed a fraudulent act in obtaining

employment, the possibility of deportation, the likelihood of the alien voluntarily returning to his home country, and the individual alien's migration patterns.  In any event, the determination should be based on "what the plaintiff would have earned," instead of what the plaintiff should have earned.  The proper measure of damages is the one that comes closest to measuring the plaintiff's actual, probable future income under the greatest variety of circumstances. ...

While many illegal aliens could feasibly spend their entire working lives in the United States, some illegal immigrants are actually caught and deported.  Many others return to their home countries voluntarily, or migrate back and forth as the job market dictates.  If awarded lost future earnings at United States wage rates, those aliens who would have migrated back to their homeland or were under threat of imminent deportation would end up with far more in damages than they would actually have earned, turning compensatory damages designed to make them whole into an unwarranted windfall for the plaintiff.  This approach further fails to take into account those aliens who have obtained their jobs through fraudulent means in violation of IRCA, and what effect this fraud should have on their recovery of last future wages.

58 Baylor L. Rev. at 1007-08 (internal footnotes omitted); *see also Andrade Garcia v. Columbia Med. Ctr. of Sherman*, 996 F. Supp. 617, 622 (E.D. Tex. 1998) (damage expert correctly used life expectancy tables in Mexico, Bank of Mexico's discount tables for wages and interest, etc.).

The McDonald and Patterson reports consider none of these factors and are thus misleading for the jury.  This Court, if course, has a duty under both *Daubert* and FEDERAL RULE OF EVIDENCE 403 to exclude evidence which would confuse the jury and provide little, if any, probative evidence in the case to be decided.  *Rogers v. Raymark Indus.*, 922 F.2d 1426, 1429-30 (9th Cir. 1991); *New Mexico v. General Elec. Co.*, 322 F. Supp. 2d 1237, 1257 (D.N.M. 2004), *aff'd in part*, 467 F.3d 1223 (10th Cir. 2006); *J&J*

13

*Snack Foods v. Earthgrains Co.*, 220 F. Supp. 2d 358, 369 (D.N.J. 2002).  This Court must therefore exclude the studies and values derived exclusively from the wages and lifestyle choices of American workers, which lack any attempt to consider the factors discussed above which are unique to these Plaintiffs.

If, however, Plaintiffs' damages experts have any testimony as to the basic factors commonly considered by economists in evaluating wage losses for workers similar to Plaintiffs and which were previously disclosed in the Rule 26 reports, the Court will evaluate such testimony under *Daubert*. *Robinson v. Missouri Pacific R. Co.*, 16 F.3d 1083 (10th Cir. 1994); *Moore v. Kroger Co.*, 800 F. Supp. 429, 436 (N.D. Miss. 1992), *aff'd*, 18 F.3d 936 (5th Cir. 1994).


## O R D E R

The testimony of Dr. McDonald as to the value of a statistical life and Mr. Patterson as to the value of lost earning capacity, lost household services, future medical expenses, and the statistical value of an average life in America are all barred by *Daubert* as they were all computed using average figures applicable only in the United States.

14

**SO ORDERED** this 29th day of August, 2008.

**BRUCE D. BLACK**
**United States District Judge**